### HAVILAND *v.* HAYES.[1]

#### *Insanity.*

What facts constitute such evidence of continuous insanity, as will avoid a deed. In such case, the judgment of a jury aided by the ability and discretion of an enlightened judge, is not to be lightly disregarded.[2]

APPEAL from the general term of the Supreme Court, in the second district, where a judgment entered in favor of the plaintiff, in a case tried by the court, after a finding of certain issues by a jury, had been reversed upon the facts, and a new trial awarded; the plaintiff stipulating for judgment absolute, in case of affirmance.

This was an equitable action by Asahel P. Haviland against John P. Hayes, to set aside a deed executed by Park Haviland and wife to Albert Haviland, on the 14th June 1848, and also a deed of confirmation, by the said Park Haviland to the defendant, on the 13th December 1851, on the ground of the insanity of the grantor.

Albert Haviland died in April 1855, having previously mortgaged the premises in question, and the defendant became the purchaser thereof, at a foreclosure sale, under that mortgage; after which, Park Haviland gave him a deed of confirmation. The said Park Haviland died in June 1856, and the plaintiff, as one of his heirs-at-law, commenced this suit to set aside the said deeds.

Issues were framed presenting various questions as to insanity of Park Haviland; on the trial of which, the

[1] Also reported in 4 Trans. App. 214.

[2] This case presents no question of law, it was purely one of fact, upon the evidence.

jury found specially that the said grantor was insane, and legally incapable of executing the deeds in question. The evidence on the subject of his insanity is fully stated in the opinion.

*The case was subsequently tried before the court, at special term, by the judge who had presided at the trial of the issues; when it was found by him, as a fact that the deeds were executed as alleged, that the said Park Haviland was then insane; and it was adjudged, that they be cancelled, and that the plaintiff was entitled to recover one-fourth of the lands embraced therein. The judgment, however, was reversed by the general term, *upon the facts*, and a new trial awarded; whereupon, the plaintiff appealed to this court, giving the usual stipulation.　　　　[ * 26

*Nelson*, for the appellant.

*Parker*, for the respondent.

HUNT, J.—In border cases, it may be difficult to say, what is sanity and what is insanity. A distinguished writer says: "No one can say where twilight ends or begins, but there is ample distinction between day and night." Between sanity and insanity there is ample distinction. It is not necessary to attempt a definition of insanity, nor to criticise that made by Lord Brougham, or Sir John Nicholl, or Dr. Ray, or to distinguish between the definitions given by numerous other eminent writers. The present is not a case of twilight, but one having ample distinction as to its character.

A course of action, for a series of years, entirely different from that governing mankind at large, and different from his own former conduct and character; where the principles, feelings, emotions and

29

grounds of action differ entirely from those we all recognise as governing ourselves; where the individual, without motive, abandons the better and higher parts of his nature, neglects civilization and refinement and comfort; where this difference is permanent and marked; where the change in his intellectual capacity, from that of an educated, careful and attentive business man, is to one who is allowed *no money, except a trifle, like that which will please a child; whose property and person are entirely under the control of others, brutally exercised, and uncomplainedly submitted to; who requires the daily care of his wife to shave him; who, at length, becomes an inmate of a lunatic asylum, confessedly insane, and who thenceforward lives and dies a lunatic; all these circumstances indicate a clear case of insanity. Nice distinctions are not here required.

* 27 ]

Prior to certain pecuniary losses, which occurred before 1827, it is proved, that Park Haviland was a good business man, prudent, discreet, cheerful, a quiet member of the Society of Friends in his vicinity, ordinarily liberal, and in no way distinguished in his conduct from the mass of his neighbors.

Numerous witnesses were examined, who testified, that, for many years prior to 1848, and commencing as early as 1827, they had heard him shouting, praying and cursing, so that he could be heard at a distance of a mile; they testified to his hiding himself from observation for many years, to his sitting in the hog-pen for hours, when occupied by the hogs, to his sullenness or stupidity at his house, that he complained of pain in his head, and that all the business was transacted by his wife and his son. If these were isolated transactions, not parts of his permanent character, I should not place much reliance upon them, as I do not upon the isolated instances of self-control or good conduct, to which I shall hereafter refer. They seem, however,

to have been his general characteristics for many years. His old acquaintances, who had known him for forty years, his friends in the church, his relatives, all concur in their general estimate of his character, and in their description of his conduct, and in the change in his character which then took place. The persons best qualified to speak upon this subject were those who had that opportunity of constant observation which a residence in the same family would give, who could see him at the table, in the family circle, and who knew his habits, during a period of years, in all the relations of life. It is to the wife, the children and the domestics of the family that *we should naturally look for the fullest information. Their testimony is [ * 28 quite satisfactory to me, confirmed as it is by so many other witnesses in the case.

The wife testifies, that she was married to Park Haviland in 1827; that, after her son Albert was eighteen years of age, she and Albert managed the farm until 1850; that prior to this, it was managed by his other sons, George and Asahel; that her husband did no business, except to do an errand, as a child, when requested, that he took no interest in the business and did no work. As early as the birth of her son Albert, in 1827 or 1828, and on that occasion, without any family difficulty, he went away and was absent for three or four weeks. He was absent again from September until March, leaving his wife and her infant child at home, with a son by a former wife, and without cause or occasion. In describing his condition at a later period, this witness says, "from 1845 to 1849, my son exercised control over his father; he would lay hold of him, and tell him to do so and so; he would strike him at times, and tell him to hush up; he would have raving times, and chase people with an axe; he used indecent language to people travelling on the road; when struck or took hold of, he would obey; the same,

31

before giving the deed, and the same afterwards." It was only her consent, as it appears from her testimony, that was necessary to the execution of the deed, and, when that was obtained, and at her request and Albert's, the father, without inquiry or remonstrance, executed the deed. It was the wife, and not the father, who required the agreement for support to be previously made; and, when made to her satisfaction, the affair was completed. On his return, under her charge, from the execution of this deed, he got out of the wagon, upon the idea of fixing the harness, so unbuckled it that, on starting, the horse walked out of the harness and away from the wagon. The wife then got out, re-arranged the harness and drove him home, he sitting quietly in the wagon. She says, that after the birth of Albert, her husband had no money, except that some-times the boys would give him a few shillings to please him. Sometimes, he would halloo and swear, night and day, *and at all times; at other times he would be quiet. "I tried to keep these things from the world." Such would be the prompting both of delicacy and affection.

In 1847, Park's eldest daughter came home and remained until the fall of 1848. Mrs. Haviland says, that her husband was cross to her, and thought she was not his daughter, but some of the Toffery folks. His wife shaved him, during all this period, because she was afraid to trust him with a razor. He was once found away from home, in an out-building, with a rope. On her cross-examination, she states, that she lived in the house with him, before her marriage; that he was then wrong, at times, but after his loss of property, the disease grew upon him; he would swear and be noisy, without provocation; that there was but little conver-sation except her efforts to keep him calm.

The hired man Woodin was called by the defendant, and testified to some transactions of business by Park

Haviland, between April 1850, and June 1851, the period of his residence in the family. On his cross-examination, after stating certain matters hardly fit to be discussed, he says, that when excited, he was very profane. The sight of Croft would excite him; he said, he was going to have him in state prison; he never saw Croft pass, without getting in a rage; this animosity was entirely without cause. He chased a black man with an axe. She (Mary Jane Crank) threw a pail of water on him, one day, and then struck him with the pail; they had a fight; each had a weapon. He was swearing at the table, and Albert threw a vinegar cruet at him; I saw Albert take him by the collar, and throw him down, and ordered him in the house; I thought, from the noise, Albert was whipping him; he hallooed "Oh! oh dear!" a good many times. A man came there by the name of Halley; Albert ordered Park in the house; he went in, and after a while came out, and said the prisoner had got loose; Albert had tied him up. Albert went in with him again, and came out without him. Park was the largest—a large, strong man. He ordered him to shut up; said, "shut up your *damned old head." He did not obey. Albert [ * 30 tried to slap him, and he could not, and left without his breakfast. I saw Albert jerk him on the floor; he got up and went to George's, as he said, and George said it was good enough for him. * * * I have heard him 'nights, after he had gone to bed, talk about the black man; he kept me awake; he said the black man had stolen a crow-bar.

Mary J. Ryder testified, that she lived in the family of Park Haviland from 1842 to 1850; she says: "I did observe the acts and conduct of Park Haviland, while I resided there; he acted very boisterously, curse and swear and hallooed, night and day; he would go into the fields and sit for hours at a time; he would wring his hands a great deal; he chased me several times

with an axe; he would frequently wish thunder and lightning would strike the family; he would talk obscene language, let who would be present. These acts took place almost all the while, particularly, the last year of my staying there. There were a great many of his acts which I cannot describe." In answer to another inquiry, she said, that "Albert was very cross and ugly to his father, for a year or more before I came away; would often strike his father, sometimes two or three times a day, when he got angry at him; I have seen Albert jerk him around and kick him; this was quite frequent, during the last year I lived there; Albert could make him mind, whenever he wanted to. * * * Albert used to threaten to whip his father, if he did not give him a deed. * * * When they were in the house together, Albert was continually coaxing and threatening him for a deed. Saw Albert get angry with his father, because he did not want to give him a deed, several times, and then he would strike him and jerk him around the room, and sometimes down on the floor. This conduct was frequent in the spring of 1848, and continued as long as I lived there."

We have no evidence that can be relied upon as to his physical health when the change in his character first occurred, except his complaints of pain in his head. If it had appeared, that at the same time, his bodily health was seriously affected, that he lost his strength, that his vital energy failed, I *think, there [* 31 ] would have been the strongest reason for believing that a disease of the brain was the seat of the difficulty. It would be no objection to this theory, that he should subsequently have become large and fleshy, as this bodily condition is of common occurrence among those whose brain is seriously diseased.

The case was fully and fairly tried. The charge to the jury was not only correct, but it was wise and discriminating. They pronounced it to be a case of insanity.

34

I place great reliance upon the verdict of a jury thus guided and directed, more than upon the opinion of the judges at a general term, however learned they may be.

To show his mental capacity, it was proved by a stage-driver, that the deceased grantor, about the date of the deed, was in the habit of sending notes by him for discount at the bank, and receiving the proceeds in return. Stage-drivers embrace all degrees of character, from the careful and worthy proprietor to the worthless vagabond. It was for the jury to designate the position of this individual. The proof is most abundant, that at this time, as well as for years before and after, the deceased was the mere instrument of his son, submitting to his orders and obeying his wishes, that all the business of the farm and family were done by his wife and son, with the exercise of no judgment or authority on his part. I do not feel at liberty to disregard the opinion of the jury on this branch of the case.

It was proved also, that the deceased grantor applied to a justice of the peace to draw the deed to his son, and to Mr. Aiken, to draw a bond for the support of himself and wife, and that his conversation was reasonable, and conduct free from exception, on those occasions. It was proved also, that he executed the quitclaim deed to Mr. Hayes in the presence of a number of witnesses, and acted as a man of ordinary intelligence would have done. This was testimony eminently for the consideration of the jury. They may have credited the statements fully, or they may have taken them with qualifications. I can easily conceive how the jury may have *believed them substantially, and yet have reached the conclusion they did [ * 32 reach.

In the first place, the actor was well prepared for the occasion, and impressed with the necessity of careful deportment. He was well dressed and carefully shaved

by that faithful wife, who had performed that duty for him during a period of twenty-seven weary years. He was probably well prepared by his son, as well by instruction as by persuasion, or by that rougher treatment of which the case contains so much painful evidence. The wife describes the preparation for the transaction, and the almost automatic manner in which Park performed his share in it. She says, that Albert asked her, when she and his father were going to execute the deed; she said, not until he executed the bond. The same day, the bond was executed and given to her, and she then consented to execute the deed. She proceeds: "I said to Park, 'We will go down to Wesley Stark's, and have the deed executed;' he made no reply; I fixed him, shaved him myself, as I had done for twenty years, got him ready and said, 'Park, we will go;' I put the deed in my pocket; Albert said to me, 'Take some money, and pay Stark for executing the deed;' Park did not resist or make any reply; we got into the wagon; I drove three miles to Stark's; nothing said on the road about the business; when I drove up to Stark's, I said, 'Here is a gentleman wishes to do a little business with you;' he asked who it was; I said, 'Park Haviland;' he said, 'What does he want done?' I handed him the deed; he said, 'Do you do this of your own free will?' Park did not appear to take any notice of it; I looked up to him and nodded my head, and Stark went on writing. * * * Stark said, 'You may come now, and put your name to it;' I handed him my glasses, and he went and put his name down; I also signed it; he had no glasses of his own; he always used mine; the deed was not read to him, or by him in my presence; when Stark said the deed was done, I took it and put it in my pocket, and gave it to my son no one was present when I gave it to him; I don't know that Park knew of the giving the deed to Albert."

36

*That Mr. Hayes had arranged the scene in which he was a party, is reasonably apparent, from his assembling so many persons to witness the transaction, and his previous request to one of them, to put certain questions to Haviland, which the witness failing to do, Mr. Hayes himself put the questions and received the desired answers.

In the next place, it is well to consider here, that the insane man is not in the same condition at all times. A man may be certainly insane, although to be not either a raving maniac or an absolute imbecile. Nor is it necessary that a delusion which possesses him should at all times operate with the same force, or that his self-control should at all times be entirely lost. The benevolent institutions to which this class of unfortunates are now committed endeavor to stimulate this self-control by rewards or deprivations. The permission to work in the fields or the garden, to go to the post-office, to sell their productions, to dine with the better class of patients, to discharge any duty, or to fulfil any trust or confidence, are held out as rewards for good conduct and self-control. These motives produce the most striking results, and show that the power of controlling their conduct and conversation is much more within the possession of the patients than is generally supposed. Nevertheless, such parties are undoubtedly insane. If a person has so little or such perverted intellect that he is unable to comprehend the subject before him, in its relation to himself, the party with whom he is dealing, and others who have claims upon his justice or his bounty, his contract ought not to be sustained. He may be able to restrain his violence for the moment, and to converse with discretion and judgment for a brief period; there may be remissions or mitigations of his disease, and yet he be insane. The two physicians who had been long connected with lunatic asylums, gave it as their judgment that such

was the case with Park Haviland. On the question of *compos mentis*, simply, and irrespective of the measure or extent of capacity, I concur with the jury, that he was not *compos mentis*, and that the deed was obtained by undue influence. *I have great confidence in the good sense and judgment of a jury, as applied to such cases; and, when guided by the ability and discretion of an enlightened judge, I think, their verdict should not be lightly reversed.

*[ *34 ]*

A decent, quiet, sober, orderly man meets with losses, important, as he supposes, to his position in life. From this time, he abandons his business, soon secretes himself from observation, complains of his head, at length, becomes noisy, obscene and profane, shouts, sings and prays, so that he can be heard for the distance of half a mile. From month to month, and year to year, he becomes more changed in his character; he becomes subject to fits; he is found sitting for hours in the hog-pen among the swine; he ceases to be consulted about anything; his wife and his son transact all his business; he has no money, except a few shillings given to please him; he does nothing, except a few errands, as a boy; his son horsewhips him, ties him with cords and throws him upon the ground, to which the father, though larger and stronger than the son, submits uncomplainingly; he has no spectacles of his own; he is shaved by his wife, for a period of twenty-seven years; he attempts to commit suicide; he quarrels with the servant girls on the most trifling pretences, follows them with an axe; he gives a deed of his farm at the simple direction of his wife, without remonstrance or inquiry; and, in three years thereafter, he is placed in a lunatic asylum as confessedly insane, and dies an undoubted lunatic.

Upon such evidence, the jury pronounce him insane. I cannot concur in overruling this verdict. On the contrary, I am satisfied with the finding of the jury, that Haviland was insane at the time of the execution

of the deed to his son, and at the time of the execution of the deed to Mr. Hayes. The judgment of the general term must be reversed, and that of the special term affirmed.

> Judgment reversed, and that of the special term affirmed.